**Rayfield NEWLON, Petitioner,**

v.

**Bill ARMONTROUT, Respondent.**

No. 86–4229–CV–C–5.

United States District Court,
W.D. Missouri, C.D.

June 2, 1988.

Richard Sindel, Sindel & Sindel, Clayton, Mo., for petitioner.

Stephen D. Hawke, Asst. Atty. Gen., State of Mo., Jefferson City, Mo., for respondent.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

This petition for writ of habeas corpus was filed pursuant to 28 U.S.C. § 2254 by Rayfield Newlon, an inmate in custody at the Missouri State Penitentiary. The petitioner seeks to vacate the sentence of death imposed on him after a jury trial in the Circuit Court of St. Louis County, Missouri in August, 1979.

Petitioner's conviction was affirmed on direct appeal by the Missouri Supreme Court in *State v. Newlon*, 627 S.W.2d 606 (Mo.1982), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). Petitioner then filed a motion to vacate the sentence pursuant to Missouri Supreme Court Rule 27.26. The motion was denied. The Missouri Court of Appeals affirmed the denial and denied a request for a rehearing or transfer to the Missouri Supreme Court. *Newlon v. State*, 705 S.W.2d 590 (Mo.Ct. App. 1986).

The petition for habeas relief contains four claims:

(1) The petitioner was denied due process of law due to the prosecutor's improper argument in the penalty phase of the trial, which was not only inflammatory and prejudicial, but also diminished the jury's sense of responsibility in imposing the death penalty;

(2) The petitioner was denied his right to effective assistance of counsel during the penalty phase of the trial;

(3) The trial court unconstitutionally limited the factors the jury could consider in mitigation of the death penalty; and

(4) Missouri's "depra struction on aggravat. is unconstitutionally vag

The petitioner does not at\ verdict or proceedings in the g the trial, but challenges the in the death penalty in this case on of these four claims.

## I. *Background*

Petitioner was charged with capital der under Mo.Rev.Stat. Section 565.001, that defendant, acting with others, fe. niously, unlawfully, willfully, knowingl\ and deliberately and with premeditation, killed Mansfield Dave," the proprietor of a small confectionary in Kinloch, Missouri. At the time, petitioner was a 23–year-old black male with an 11th grade education. He had previous convictions involving burglary, larceny and stealing. He had served time in the penitentiary.

The evidence connecting defendant with the crime consisted of the testimony of a participant, Walter West, and statements by petitioner to police while in custody. Petitioner's statements were conflicting. In an initial statement to the police, he admitted helping West and Franz Williams, a third participant, saw off a shotgun and go to the store intending to rob it. However, he contended that he had stayed in the car while West and Williams went inside the store. Williams, whose fingerprints were identified on a soda bottle left on the check-out counter of the confectionary where Dave was shot, was not called as a witness although he had been arrested, confined, and charged with capital murder.

Petitioner later made a videotaped statement where he admitted that he had entered the store with Williams but that Williams had done the shooting while petitioner was in the rear of the store. In this statement he also asserted that, before entering the store, Williams had expressed the possibility that he "might have to shoot" Mr. Dave because he knew him.

In his testimony at trial, petitioner denied being present at the scene and denied killing Mr. Dave. Walter West testified that Williams came from the back of the

re just as petitioner was at the counter messing with the shotgun." When Mr. Dave turned around, there were two consecutive "puffs of smoke," and then Williams and petitioner fled from the store. West stated that he observed this from his vantage point sitting in his automobile on the opposite side of the street from the store. West quoted petitioner as reporting to him later that "I had to burn him."

The robbery plan failed, as no money was taken from the store. However, Mr. Dave suffered two gunshot wounds and died. Mrs. Dave testified that she ran toward the store when she heard an alarm and saw Williams, noting that he was not carrying anything. This statement apparently corroborated West's testimony that petitioner, not Williams, did the shooting. The shotgun was delivered to the police by West's cousin.[1] The jury found petitioner guilty of capital murder. No additional evidence was presented at the punishment phase of the trial.

## II. *Standard of Review*

■ The standard of review for habeas corpus petitions by prisoners in state custody is set out in 28 U.S.C. § 2254(d). A written determination after a hearing on the merits of a factual issue, made by a state trial or appellate court of competent jurisdiction, is presumed to be correct unless one of the conditions set forth in § 2254(d)(1)–(7) is found to exist. If none of these conditions is found, or unless the state court determination is "not fairly supported by the record," 28 U.S.C. § 2254(d)(8), the petitioner must establish by convincing evidence that the factual determination by the state court was erroneous. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

This presumption of correctness does *not* apply to legal findings or to mixed questions of law and fact. *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 1306, 71 L.Ed. 2d 480 (1982). Factual issues involve "what are termed basic, primary, or historical facts: facts 'in the sense of a recital of

external events and the credibility of their narrators....'" *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Mixed questions of law and fact, however, involve "the application of legal principles to the historical facts of [the] case." *Cuyler v. Sullivan,* 446 U.S. 335, at 342, 100 S.Ct. 1708, at 1714, 64 L.Ed.2d 333 (1980). As Justice Frankfurter once stated: "Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts ... the District Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge." *Brown v. Allen,* 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953). *Cf., Sumner,* 102 S.Ct. at 1306.

## III. *Exhaustion*

■ Under 28 U.S.C. § 2254(b), exhaustion of state remedies is a prerequisite to the filing of a petition for a writ of habeas corpus. *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). The purpose of this requirement is to further the principles of comity by permitting state courts to have "the first opportunity to hear the claim(s) sought to be vindicated." *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 620, 88 L.Ed.2d 598 (1986); *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971).

"To exhaust his state remedies, a habeas petitioner only needs to have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim[s]." *Little v. Armontrout,* 819 F.2d 1425, 1428 (8th Cir.1987). Where each of the claims in the petition were either "expressly raised by [the petitioner] in state court proceedings or discussed by the state courts," then the state courts have been provided with a "fair opportunity" to rule upon all claims presented in the habeas petition. *Id.*

---

1. Although West had also originally been charged with First Degree Murder in the death of Mr. Dave, he made an agreement to testify for the state and pled guilty to Second Degree Murder for a ten-year sentence in a penitentiary out-of-state.

Here, the petitioner raised and the state courts have discussed each of the petitioner's four claims. Petitioner's "Second Amended Petition Under Supreme Court Rule 27.26," at 4–5, filed Feb. 10, 1984, clearly presents his constitutional claim that he was denied due process and Eighth Amendment protections due to the prosecuting attorney's improper argument in the penalty phase of the trial. *See also* supporting "memorandum of law" to Second Amended 27.26 Petition, at 22–32. In affirming the denial of this motion, the Missouri Court of Appeals for the Eastern District expressly stated: "The prosecutor's argument did not deprive movant of a *fundamentally fair* trial." *Newlon v. State,* 705 S.W.2d at 592. (emphasis supplied).

The state courts also expressly considered plaintiff's constitutional claim of ineffective assistance of counsel at the penalty phase of the trial. In *Newlon,* 705 S.W.2d at 595, the Court of Appeals expressly cited the relevant federal constitutional case, *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in addition to *Seales v. State,* 580 S.W.2d 733, 736 (Mo.1979), which held that the courts of Missouri apply the same standards as the federal courts in the Eighth Circuit for determining the effectiveness of counsel.

The State Appellate Court discussed petitioner's claim that the trial court's instruction No. 21 limited the jury's consideration of mitigating factors when deliberating on the death penalty. *Newlon,* 705 S.W.2d at 593. Although the Court noted initially that it does not ordinarily review instructional error under Rule 27.26, it in fact did address the merits, and quoted the United States Supreme Court in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the leading case on this issue.

Finally, petitioner's fourth claim was expressly considered and rejected by the Missouri Supreme Court on direct appeal. *State v. Newlon,* 627 S.W.2d at 621. Here, petitioner alleges that the phrase "depravity of mind" in the aggravating circumstances listed in Mo.Rev.Stat.

§ 565.012.2(7) is unconstitutionally vague and violative of the due process clause of the Fourteenth Amendment. The Missouri Supreme Court examined the claim and based its discussion on *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The Missouri Court of Appeals refuses to reconsider contentions rejected in the original appeal in a 27.26 proceeding. *Newlon,* 705 S.W.2d at 591. The exhaustion requirement has been satisfied.

### IV. *Procedural Default*

■ Respondent additionally asserts that this Court lacks jurisdiction to decide the issues in petitioner's first claim that the prosecutor's comments were unconstitutional because no contemporaneous objection was made at the trial. Petitioner concedes that Missouri has a "contemporaneous objection rule."

In *Wainwright v. Sykes,* 433 U.S. 72, 84, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1977), the court held that, absent "a showing of cause for noncompliance and ... actual prejudice resulting from the alleged constitutional violation," a federal court is barred from addressing issues on habeas corpus if the state courts refused to hear the claim on the basis of an independent and adequate state procedural ground. However, "[t]he mere existence of a basis for a state procedural bar does not deprive [the federal court] of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 2638, 86 L.Ed. 2d 231 (1985), *citing Ulster County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

In *Ulster County,* the court noted that the purpose behind the *Wainwright* rule is based on considerations of comity and "to accord appropriate respect to the sovereignty of the states in our federal system." *Ulster County,* 442 U.S. at 154, 99 S.Ct. at 2223. However, no such disrespect is implied where the state court's denial of postconviction relief was not based upon the contemporaneous objection rule but, rather, was a decision on the merits. Therefore, the federal court can also reach the merits

of petitioner's claim for habeas relief. *Euell v. Wyrick,* 675 F.2d 1007, 1009 (8th Cir.1982).

It is apparent on careful examination, as noted above, that the Missouri Court of Appeals did not ignore petitioner's claim that the prosecutor's arguments were unconstitutional. Instead, it summarily rejected the claim on its merits by concluding that "[t]he prosecutor's arguments did not deprive movant of a fundamentally fair trial." *Newlon,* 705 S.W.2d at 592.

Even though the Missouri Supreme Court purported to examine the remarks under the plain error rule on direct appeal, the principal opinion discusses at length the propriety of the prosecutor's argument. *Newlon,* 627 S.W.2d at 616–20. The dissent discusses the constitutional issues raised, even if the word "constitutional" is not used, concluding that the death sentence "was imposed under the influence of passion, prejudice, and other arbitrary factors due to the prosecutor's argument." *Newlon,* 627 S.W.2d at 633–34. (Seiler, J., dissenting, joined by Bargett, J.) The state's interests have been preserved where the state courts addressed the merits of the impropriety of the closing argument. Hence, under *Ulster County* and *Euell,* it is unnecessary to examine whether petitioner can demonstrate "cause and prejudice" for failing to object at trial.

### V. *Prosecutor's Improper Argument*

Petitioner presents two claims relating to the prosecutor's arguments in the penalty phase of the trial First, he asserts that the jurors were subjected to an argument based on fear, premised on facts not in evidence, and calculated to inflame the jury and remove reason from the sentencing process. When considered in light of the "totality of circumstances," it is urged that the effect of this misconduct mandates reversal of the death penalty or a new trial only on the issue of punishment. Second, petitioner argues that the prosecutor and trial court diminished the jury's sense of responsibility in imposing the death penalty, in violation of the Eighth Amendment under *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

To prevail on his first claim of prosecutorial misconduct, petitioner must show that the prosecutor's actions were so egregious as to render the trial fundamentally unfair. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The errors must be of constitutional magnitude, a determination which is made by considering the totality of circumstances, and whether the entire sentencing proceeding was fundamentally unfair. *Id.* Of course, "the process of constitutional line drawing in this regard is necessarily imprecise." *Id.,* 94 S.Ct. at 1872.

Petitioner first complains of the prosecutor's expressions of his personal belief in the propriety of the death sentence in this case and by appearing to have special knowledge outside the record:

Now, when I said initially, that this was a difficult thing for me—I've been a prosecutor for ten years and I've never asked a jury for a death penalty, but I can tell you in all candor, I've never seen a man who deserved it more than Rayfield Newlon. By returning your verdict in this case,—and you people found him guilty of capital murder—that either means that you believe beyond a reasonable doubt that he pulled the trigger, or that he had the frame of mind that's consistent with pulling the trigger, and I submit to you, that Rayfield Newlon did pull the trigger, and didn't pull it once, but pulled it twice—executed an innocent man in cold blood.

So, where do we go from there? I say to you that I never saw a man who deserved it more and I say that to you in complete sincerity, and it's my job, as I see it, to tell you that. (Tr. at 599–600).

"An attorney's personal opinions are irrelevant to the sentencing jury's task." *Brooks v. Kemp,* 762 F.2d 1383, 1408 (11th Cir.1985). Here, the discussion of the prosecutor's practice of declining to seek the death penalty *until* this particular case arose was improper. The claim was unsupported by the evidence and irrelevant. It also implied to the jury that the state believed that this case, above others, warranted the death penalty. *Id.* at 1410. The

argument is particularly offensive because during most of this 10–year period, the death penalty statutes in Missouri were considered unconstitutional and no defendant, no matter how heinous, atrocious or cruel his crime, faced the possibility of a capital sentence. *See State v. Duren,* 547 S.W.2d 476 (Mo.1977) (en banc). "Because the jury is empowered to exercise its discretion in determining punishment, it is wrong for the prosecutor to undermine that discretion by implying that he, or another high authority, has already made the careful decision required. This kind of abuse unfairly plays upon the jury's susceptibility to credit the prosecutor's viewpoint." *Brooks,* 762 F.2d at 1410.

The prosecutor carried this theme throughout his argument:

"This is the first time I've ever made this argument, and I'm kind of groping for words—which I'm sure appears obvious to you, because it's my job to get you people over that intellectual hump or obstacle, that killing is bad. Killing in self-defense is not bad; killing in war is not bad; taking Rayfield Newlon's life is not bad.... (Tr. at 600).

I submit to you that he deserves to die. He doesn't deserve to breathe the same air that Mrs. Dave breathes. She's a widow with a son, and he is a son with no father. He doesn't deserve to breathe the same air. (Tr. at 601). I'm telling you that Rayfield Newlon deserves to die, not only for what he did, but I think it is absolutely critical to say to him and others like him ... that you have to stop killing. (Tr. at 602).

The prosecutor ended his argument by emphasizing his position of authority and adding a final vivid description of the victim:

"Today I'm talking to you as Prosecuting Attorney of this County—the top law enforcement officer in St. Louis County. I represent the people of the State of Missouri in St. Louis County and on behalf of Mrs. Dave and others like her, and her son, who no longer has a father, and for Mr. Dave—and all we've seen of him is in a pool of blood on a confectionary floor—for all of them, I'm asking you for the death penalty. (Tr. at 608).[2]

"[T]he prosecutorial mantle of authority can intensify the effect on the jury of any misconduct." *Brooks,* 762 F.2d at 1399. Thus, the prosecutor's misconduct may be grounds for reversal partly because of a "systemic belief that a prosecutor, while an advocate, is also a public servant 'whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Id., quoting Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The *Berger* court summarized the danger of excessive jury influence as follows:

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, *improper suggestions, insinuations, and especially, assertions of personal knowledge,* are apt to carry much weight against the accused when they should properly carry none. *Berger,* 295 U.S. at 88, 55 S.Ct. at 633. (emphasis supplied).

These same principles apply with equal force to a prosecutor's statements in a penalty trial. It is wrong for the prosecutor to undermine the jury's discretion in determining punishment "by implying that he, or another high authority, has already made the careful decision required. This kind of abuse unfairly plays upon the jury's susceptibility to credit the prosecu-

---

**2.** Respondent's brief filed April 26, 1988 alleges that "[w]ith a sharp pencil, petitioner is able to excise sentences that he does not like to declare them to be error" ... and "perform a verbal autopsy upon a paragraph of a transcript and find unpleasant words." Respondent's "Response to Court Order," at 15–16. Thus, respondent purports to republish the entire closing argument in order for the Court to examine it for constitutional error. Ironically, however, the respondent's submitted "entire context" omits certain significant phrases and sentences, including a portion of this final paragraph cited above. The Court has examined the entire official transcript of the proceedings in consideration of the petition for habeas corpus relief under § 2254.

tor's viewpoint." *Brooks,* 762 F.2d at 1410.

Petitioner next complains that the prosecutor made other statements throughout the argument that were intended to personalize and inflame the fears, passions and prejudices of the jury. First, the prosecutor attempted to link petitioner with Richard Speck, Charles Manson, and the Son of Sam:

> You know—when I talk about sending out a message—well, I know the Charles Mansons wouldn't hear the message, or the Richard Specks or the "Sons of Sam" —those kinds of people wouldn't hear it because those people are insane—legally responsible for what they did, but they wouldn't get this kind of message, and in the same—a truer fashion, he's not insane. This was simply a business venture—you know, he didn't hear any strange voices speaking to him, he just wanted some money, and all that stood between him and the money, was Mansfield Dave, and he eliminated—executed him. (Tr. at 606).

\* \* \* \* \* \*

> If Rayfield was going to harm your child, would you kill him? Would you have prevented this killing if you'd been in the conveniency store with a gun, and you could have saved Mr. Dave's life? Would you have killed Rayfield? I think you would have—at least, I hope you would have had the courage to do either one of those. If you think you would have, kill him now. Kill him now. Once again, I hope you have the courage to do that, because it's tough.

> I really don't have much more to say, but I hope to impress upon you that this is truly a war—I mean, a "street war" and it's justifiable to kill in a war. You know there are enemies—there's no question about it. Rayfield and others like him are the enemy and it's still going to go on, and on, and on, unless you citizens of St. Louis County say it's not going to go on, and we may have to catch you and convict you, but when we do, we're going to execute you, and at least

those people won't go and do it. (Tr. at 606–07).

The prosecutor apparently intended the jury to find petitioner more egregious than infamous killers and invites the jurors to give petitioner death as punishment for the crimes of Manson, Speck and Son of Sam and to kill him before he could harm their own children. The comments equate the jury's task with self-defense and war, situations that are not analogous. Moreover, these broad comparisons undermine the requirement that the sentencing be *individualized to this particular situation.*

Leading into the diatribe set forth above, the prosecutor referred to three persons on the venire panel who had to excuse themselves because they said they would *not* consider *anything but* the death penalty if they returned a guilty verdict. Then he argued to the sentencing jury as follows:

> [T]he law gives you two alternatives. But if somebody is guilty of capital murder, the ultimate crime, why should they get anything other than death? Why should they deserve to live—even in some prison? Why should they be allowed to breathe the same air as the victim's family, and that the rest of us breathe; why should they go on living?

The death penalty differs from any other type of punishment not only in its severity and finality, but also in its impact on society. When the sovereign takes the life of one of its citizens, it is vital that "any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977). As Judge Charles Blackmar of the Missouri Supreme Court recently noted in *State v. Leisure,* 749 S.W.2d 366, 385 (Mo.1988) (Blackmar, J., concurring in part), in regard to closing argument, "[since *State v. Newlon,* 627 S.W.2d at 607,] the word is out that 'anything goes' in the penalty phase. Missouri justice should adhere to a higher standard. The penalty phase should not become a legalized lynching." Indeed, the United States Constitution demands more—federal justice requires "fundamental fairness."

The Court will evaluate whether the entire sentencing hearing was fundamentally unfair later in this section. However, because the totality of circumstances must be considered, petitioner's final challenge to the prosecutor's argument must first be examined, that is, whether the prosecutor, by his remarks, and the Court, by its failure to give a curative instruction, diminished the jury's sense of responsibility in imposing the death penalty. During the argument, the prosecutor told the jury that if they returned a sentence of death, it would be reviewed:

> Now, if you say he deserves the death penalty, under the law, Judge Ruddy must review it and if he agrees, then his decision is reviewed by the Supreme Court. (Tr. at 601).

This statement was incorrect because the trial judge does not have authority to review the sentence.[3] The prosecutor also stressed that any sentence short of death could result in only temporary confinement:

> Did he show any reaction or emotion when the verdict was returned last night? You look at him? No. He knew what was coming; he knew that what he did would send him to prison—that's no big deal—he's been there before, and what assurances do you have that he'll be there fifty years? The legislature could change the law. All it says is no parole. It doesn't say it can't be commuted. There's no assurance of that at all. The law could be changed, but at least with death there is some assurance he won't commit any more crimes. (Tr. at 602–03).

In *Caldwell v. Mississippi*, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Bias against the defendant enters here, as well as unreliability. This is in part because appellate courts are

limited in their review and, thus, generally review sentencing determinations with a presumption of correctness. *Caldwell*, 105 S.Ct. at 2641. But, of course, this was not mentioned to the jury.

The *Caldwell* court also noted another "intolerable danger of bias" in this situation: that is, "[e]ven when a sentencing jury is *unconvinced* that death is the appropriate punishment, it might nevertheless wish to 'send a message' of extreme disapproval for the defendant's acts. This desire might make the jury very receptive to the prosecutor's assurance that it can more freely 'err because the error may be corrected on appeal.'" *Id.* (emphasis supplied).

The Prosecuting Attorney requested such a message:

> "You people have got the opportunity here to *send out this message, and to send it out all over St. Louis County—your own community—*and Kinloch is a part of your community. This could have happened in Ladue, Lemay, Florissant or Ferguson—these kinds of crimes happen every day and go on happening, and you've got the opportunity to say that Rayfield Newlon's in this area, if you're going to do your killing and keep on doing it—don't do it in our community, because if you do, we're going to kill you because we got the right to do it; it's fair and appropriate and it's right—not cruel and unusual punishment—it's right." (Tr. at 602) (emphasis supplied).

Similarly, the Supreme Court has recognized that "[i]f the jury understands that only a death sentence will be reviewed, it will also understand that any decision to 'delegate' responsibility for sentencing can only be effectuated by returning that sentence." *Caldwell*, 105 S.Ct. at 2641. This creates the possibility of an execution in absence of a real determination of the propriety of the death sentence. *Id.* Moreover, if the jury is divided on the proper sentence, "the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to

---

3. *See* Mo.Rev.Stat. § 565.006 repealed by L.1983, S.B. No. 276, p. 922 § 1.

invoke the death sentence should nevertheless give in." *Id.* at 2642.

The respondent's reliance on *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), for the proposition that states are free to expose capital sentencing juries to any argument concerning post-sentencing procedures must fail. *See Caldwell*, 105 S.Ct. at 2643. As in *Caldwell*, the argument here was neither accurate (as to the trial judge's review) nor linked to any valid sentencing considerations.

In examining the totality of circumstances in the penalty proceeding, this Court is cognizant that defense counsel made no objections and failed to rebut the improper and misleading statements. Moreover, the trial judge made no comments *sua sponte* and issued no curative instructions. The prosecutor's rhetoric continued uninterrupted, and by silence, apparently sanctioned by the trial judge. Although *Donnelly* "warns against holding every improper and unfair argument of a state prosecutor to be a federal due process violation, it does not insulate all prosecutorial comments from federal constitutional objections." *Caldwell*, 105 S.Ct. at 2644.

■ Here, the prosecutor's misleading comments concerning his personal belief that this case deserved the death penalty more than any other in ten years, the prosecutor's emphasis on his authority as the "top law enforcement officer of the County," the comparison to infamous mass-murderers, the personalized analogy to the jurors' self-defense of their own children, the references to war and courage, the insinuation that all murders should be punished with death, and the reassurance that appellate review would follow if a death sentence were rendered, all combined to infect the penalty proceeding with an unfairness that violates due process. The remarks were neither isolated nor ambiguous, as in *Donnelly*, 416 U.S. 637, 94 S.Ct. 1868. By contrast, the jury was subjected to a relentless, focused, uncorrected argument based on fear, premised on facts not in evidence, and calculated to remove reason and responsibility from the sentencing process. This constitutional error requires that the sentence of death be vacated.[4]

## VI. *Ineffective Assistance of Counsel at the Penalty Hearing*

Petitioner claims that his trial lawyer, Phillip Ayers, was constitutionally ineffective during the penalty phase of the trial because he failed to investigate and prepare for the penalty phase, failed to present mitigating evidence, and failed to object to the prosecutor's improper closing argument in the penalty phase.

An ineffective assistance of counsel claim presents a mixed question of law and fact. *Kellogg v. Scurr*, 741 F.2d 1099, 1101 (8th Cir.1984). Therefore, as noted earlier, the presumption of correctness accorded the factual determinations of the state court under 28 U.S.C. § 2254(d) applies only to the historical facts underlying the attorney's performance, but a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court. *Id. Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). Moreover, certain factual findings by the state court here are "not fairly supported in the record," and thus are not presumptively correct. *See* § 2254(d). These facts will be discussed later in this section.

■ In *Strickland*, the Supreme Court set forth a two-pronged test to ascertain whether errors committed by a defendant's counsel amounted to ineffective assistance of counsel. First, petitioner must show that counsel's representation was deficient, that is, that it fell below an objective standard of reasonableness, with every effort to "eliminate the distorting effects of hind-

---

4. At the evidentiary hearing before this Court on February 18, 1988, the petitioner offered evidence that the Prosecuting Attorney had made statements at a tavern, in the presence of his assistants, that he was going to "let it all hang out" at the death penalty hearing. The Court rejected this evidence on the grounds that it was hearsay and that the argument spoke for itself. In reviewing the argument, whether the prosecutor made the rejected statement or not, it is clear that he did, in fact, "let it all hang out."

sight." *Strickland,* 104 S.Ct. at 2064–65. Second, prejudice must be shown by establishing the "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 2068. "Counsel [ ] has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* at 2065.

■ These Sixth Amendment principles apply to a capital sentencing procedure in the same manner that they apply to the guilt phase in a criminal prosecution. *Id.* at 2064, *citing Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) and *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981).

■ Applying *Strickland,* the Court finds that trial counsel's representation of the petitioner during the penalty phase fell below an objective standard of reasonableness, so that the adversarial process was seriously undermined. Ayers introduced no evidence during the penalty phase regarding petitioner's character or background.

The Supreme Court has ruled that a sentencing jury must consider "as a mitigating factor, any aspect of a defendant's character of record." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978); *cf., Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The record of the hearing for the 27.26 motion reveals that Ayers did no investigation in this regard. Surprised and disappointed at the guilty verdict, counsel stated that he didn't *consider* introducing any evidence of the petitioner's low I.Q., school records, upbringing, reputation as a follower or nonviolent nature. This was not a reasoned decision after a thorough investigation. Ayers testified that his decision was not strategic. Hearing Tr. at 311, 315. Counsel also stated that he was not aware of the Supreme Court's *Lockett* deci-

sion, Hearing Tr. at 311, and testified before this Court that he did not talk to other attorneys for advice on presenting a defense of the death penalty at the sentencing phase.

The factual historical findings of the state court are not inconsistent here. It is irrelevant that counsel did not receive cooperation from certain family members in preparing for the guilt phase of the trial. The fact that certain potential witnesses knew nothing of the events surrounding the crime has nothing to do with their ability to provide evidence of petitioner's background and character to the sentencing jury as mitigating factors. The state court's finding that petitioner did not provide the names of possible contacts is not conclusive because counsel never asked petitioner for this information, explained its importance or discussed a sentencing defense strategy with petitioner.

It is also irrelevant that petitioner may have given conflicting versions of the events surrounding the crime. Although this may have influenced the jury's decision in the guilt phase, this does not relieve counsel of the duty to investigate and prepare for the penalty trial. Witnesses at the 27.26 hearing before the state court and this Court stated that they would have testified as to petitioner's character and upbringing if they had been contacted. There is no evidence to the contrary.

Ayers did not even consider presenting any additional evidence at the penalty phase. This does not comport with the notion that the sentencing phase should be a "distinct procedure where the jury's attention is focused not just on the circumstances of the crime, but also on special facts about this defendant that mitigate against imposing capital punishment!" *Blake v. Kemp,* 758 F.2d 523, 534 (11th Cir.1985). "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 2589, 91 L.Ed.2d 305 (1986). Here, there was neither. Thus, these facts distinguish

this case from *Burger v. Kemp*, —— U.S. ——, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

In *Burger*, trial counsel presented no mitigating evidence at the sentencing trial, but had investigated his client's background and made a *strategic decision* that his client's interest would not be served by presenting such evidence.

Unlike the *Burger* case, however, Attorney Ayers admitted that he never discussed with petitioner the possibility of calling witnesses in the penalty phase, nor did he ever seek petitioner's help in procuring witnesses to demonstrate his character or background. The total lack of preparation for the penalty trial here put at risk "the reliability of the adversarial testing process." *Id.*

▮ Trial counsel also erred when he did not object to the prosecutor's inflammatory remarks in the penalty phase and failed to make any effort to rebut the same in his own closing argument. The state hearing court's finding that the failure to object was a deliberate strategic choice is contradicted by the record and not entitled to a presumption of correctness. Both at the state hearing and before this Court, counsel was unable to explain or excuse his failure to object. When asked about specific sections of the prosecutor's argument, he acknowledged that the remarks were improper and objectionable but stated several times that he didn't know why he failed to object. Although he opined that at some unknown point he felt the prosecutor's remarks "were so prejudicial" that "there could be a chance on appeal," he clearly affirmed that this was *not* a strategic reason. At the hearing before this Court, Ayers again offered only this explanation: "I simply was caught flatfooted."

"The failure to object may in some circumstances be so derelict that the claim of ineffective assistance of counsel must be sustained." *Riley v. Wyrick*, 712 F.2d 382, 385 (8th Cir.1983). The attorney acknowledged even at the beginning of his own argument that he was totally unprepared to defend his client against the death penalty:

"I know I'm not as effective as Mr. Westfall—I don't know what to say. I thought about it all night. I just don't know what to say. The only person that can stand up for Rayfield, though, is me. Please don't kill him. He didn't do it."

Ironically, Ayers was not able to stand up for petitioner with mitigating evidence, or to rebut the prosecutor's devastating argument. The failure to object or counter the attack again was a failure to ensure a reliable adversary proceeding. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Combined with the failure to produce any information of petitioner's background or character as a mitigating circumstance, trial counsel's representation falls outside the bounds of reasonable professional behavior and satisfies petitioner's burden under the first prong of the *Strickland* test.

The second prong of *Strickland* is also satisfied. The prejudicial effects of the prosecutor's argument were discussed in the previous section. Counsel's failure to object prevented any ruling which could have stopped the continual tirade or softened the effect with a curative instruction. The attorney did not attempt to correct the prejudicial effects or other errors of law by rebuttal.

Moreover, in a capital case where the defendant is youthful and mentally slow, evidence of these facts are extraordinarily germane to the individualized inquiry that the sentencing jury is constitutionally required to perform. Evidence of a turbulent family history is particularly relevant and must be considered by the jury. *Eddings*, 455 U.S. at 115, 102 S.Ct. at 877. The petitioner certainly would have been unconstitutionally prejudiced if the court had not permitted him to put on all mitigating evidence at the penalty phase. *Lockett*, 438 U.S. at 604, 98 S.Ct. at 2964. Here, Ayers' "failure to seek out and prepare any witnesses to testify as to mitigating circumstances just as effectively deprived him of such an opportunity." *Blake*, 758 F.2d at 535. As in *Blake*, counsel's actions in this regard "were not simply the result of a tactical decision not to utilize mitigation

witnesses once counsel was aware of the overall character of their testimony. Instead, it was the result of a complete failure—albeit prompted by a good faith expectation of a favorable verdict—to prepare for perhaps the most critical stage of the proceedings." *Id.*

These professional errors, taken together, raise a reasonable doubt that, but for the errors, the outcome of the sentencing procedure would have been different, and petitioner would not have been sentenced to death. Hence, the petitioner's death sentence violates the Sixth Amendment.

## VII. *Limitation of Mitigating Factors*

Petitioner argues that Instruction No. 21 precluded the jury from considering as mitigating factors any evidence except that pertaining to the murder and three other specific factors. Instruction No. 21 reads as follows:

### Instruction No. 21

If you decide that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death, as submitted in Instruction No. 20, it will then become your duty to determine whether a sufficient mitigating circumstance or circumstances exist which outweigh such aggravating circumstance or circumstances so found to exist. In deciding that question, you may consider all of the evidence relating to the murder of Mansfield Dave.

You may also consider:

1. Whether the defendant was an accomplice in the murder of Mansfield Dave and whether his participation was relatively minor.

2. Whether the defendant acted under extreme duress or substantial domination of another person.

3. The age of the defendant at the time of the offense.

If you unanimously decide that a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found by you to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of fifty years of his sentence.

Petitioner contends that jury instructions which effectively prevent consideration of any mitigating circumstances are impermissible under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In *Lockett*, the Court concluded that:

[T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Id.* at 604, 98 S.Ct. at 2964 (emphasis in original).

Petitioner has also pointed out that, subsequent to his trial, the Missouri Supreme Court apparently recognized the deficiency in this instruction by adding a third paragraph:

"You may also consider any circumstance which you find from the evidence in extenuation or mitigation of punishment." (MAI CR2d 15.44) (for Homicides committed after May 25, 1977).

The third paragraph of the instruction form has since been changed again to provide:

"You may also consider any circumstance which you find from the evidence in mitigation of punishment." (MAI CR2d 13.44) (for Homicides committed after Sept. 30, 1984).

In *Eddings v. Oklahoma*, 455 U.S. 104, 113–14, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982), the Supreme Court further clarified that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." These cases were recently reaffirmed by a unanimous court in *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

This Court first addresses respondent's contention that the jury was instructed to

consider all the evidence in determining mitigating facts. A close examination of the record reveals that this is *not* true. The instruction listed three specific factors in addition to "all of the evidence *relating to the murder of Mansfield Dave.*" (emphasis supplied). This obviously does not include consideration of other factors outside the events surrounding the crime, such as petitioner's family background.

As noted in the previous section on ineffective legal assistance at the penalty phase, counsel's representation was constitutionally deficient, partly because he failed to introduce *any evidence* of defendant's background and character. Thus, it is unnecessary for the Court to consider petitioner's "*Lockett* claim." However, the discussion of *Lockett* and its progency buttresses the conclusion that there was ineffective assistance of counsel at the penalty trial. Had any evidence been presented, for example, as to petitioner's upbringing, (one of 13 children raised in a one-room shanty with an abusive alcoholic father) or his learning disability, then the Constitution would require the sentencers to consider these factors as mitigating circumstances. *Hitchcock,* 107 S.Ct. 1821. In light of this clear rule, it is inconceivable that counsel's failure to present such evidence could be considered anything but prejudicial to the outcome.

### VIII. *Vagueness of Trial Court's Instruction on Aggravating Circumstances*

Petitioner finally contends that the instruction on aggravating circumstances presented to the sentencing jury was impermissibly vague. This Court agrees. Instruction No. 19 provided:

### Instruction No. 19

In determining the punishment to be assessed against the Defendant for the murder of Mansfield Dave, you must first unanimously determine:

1. Whether the Defendant murdered Mansfield Dave for the purpose of re-

ceiving money or any other thing of monetary value.

2. Whether the murder of Mansfield Dave involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman.

You are further instructed that the burden rests upon the State to prove beyond a reasonable doubt at least one of the foregoing circumstances, and that it is an aggravating circumstance. The defendant is not required to prove or disprove anything.

Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing circumstances exists and that it is an aggravating circumstance, you must return a verdict fixing the punishment of the Defendant at imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of fifty years of his sentence.

The instruction was based on Mo.Rev. Stat. § 565.012.2(7) which sets forth a statutory aggravating circumstance if the "offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." [5]

This Court notes that Instruction No. 19 did not instruct on "torture" as an alternative to "depravity of mind." The verdict fixing punishment at death indicated that the jury found only "Aggravating Circumstance No. 2" in "Instruction No. 19." Thus, because the death sentence cannot stand if this single aggravating circumstance is invalid, the analysis focuses only on the phrase "depravity of mind" as applied in this case. Although the Supreme Court has not held such language to be facially unconstitutional, it has "not stopped at the face of a statute but [has] probed the application of statutes to particular cases." *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987). A state court interpretation of the statutory language of an aggravating cir-

---

5. Repealed by L.1983, S.B. No. 276, p. 923, § 1, and replaced by Mo.Rev.Stat. § 565.032.2(7) (1988).

cumstance can be "so broad that it may have vitiated the role of the aggravating circumstance in guiding the sentencing jury's discretion." *Id.*

The Missouri Supreme Court has not provided a limiting instruction for the term "depravity of mind" even though it held that such a finding was factually substantiated in this case. *State v. Newlon*, 627 S.W.2d at 622, comparing the facts to *Turner v. Virginia*, 221 Va. 513, 273 S.E. 2d 36 (1980), which had been affirmed by the Virginia Supreme Court, and citing a list of other Missouri cases without a factual comparison. *Id.* at 623. Petitioner argues that the vagueness of the instruction is demonstrated by the jury's request during deliberations for the Court to "please give a definition of 'depravity of mind'." The trial judge advised the jury that he "could not give them any further instructions."

In *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the Supreme Court held unconstitutional a death sentence based on the finding that the offense was "outrageously or wantonly vile, horrible or inhuman." Justice Stewart, writing for a plurality, observed:

> [I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. It must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death."

*Id.* at 428, 100 S.Ct. at 1764 (footnotes and citations omitted).

Because the channeling function of an aggravating circumstance requires objective determination of such a factor, it must be described in "terms that are commonly understood, interpreted and applied." *Cartwright v. Maynard*, 822 F.2d 1477, 1485 (10th Cir.1987). Otherwise, a standard may be so vague that it would "fail adequately to channel the sentencing decision patterns of juries with the result that

a pattern of arbitrary and capricious sentencing like that found unconstititional in [*Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) ] could occur." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). The *Cartwright* court recognized that if "an aggravating circumstance is defined and applied so broadly that it conceivably could cover every first degree murder, then it obviously cannot fulfill its constitutional responsibility to eliminate the consideration of impermissible factors and to provide a recognizable and meaningful standard for choosing the few who are to die." *Cartwright*, 822 F.2d at 1485, *quoting* Rosen, *The "Especially Heinous" Aggravating Circumstance in Capital Cases—The Standardless Standard*, 64 N.C.L.Rev. 941, 954 (1986).

■ Death penalty statutes must be structured so that the penalty is not "administered in an arbitrary and unpredictable fashion." *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987). In *Cartwright*, the Tenth Circuit determined that a death sentence was invalid where the Oklahoma Court of Criminal Appeals failed to apply a constitutionally required narrowing construction of "especially heinous, atrocious or cruel" in that case. The state appellate court's description of the events surrounding the murder and conclusion that those events "adequately supported the jury's finding" did not provide a proper narrowing construction. The same situation is present here. Absent a clear, limiting directive, the words "depravity of mind" in this case are not capable of objective determination. As in *Godfrey*, "Nothing in [these] words, standing alone, [ ] implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Godfrey*, 446 U.S. at 428, 100 S.Ct. at 1765. Thus, the sentence of death in this case is unconstitutional for this reason, as well as for the reasons discussed above.

Accordingly, it is hereby

ORDERED that a writ of habeas corpus issue in this case vacating petitioner's sentence of death. Petitioner shall either re-

ceive a new trial on the penalty phase or be resentenced to life imprisonment without parole for fifty years.