**STATE of Missouri, Respondent,**

v.

**Daryl SHURN, Appellant.**

**No. 71098.**

Supreme Court of Missouri, En Banc.

Nov. 23, 1993.

As Modified on Denial of Rehearing Dec. 21, 1993.

Dave Hemingway, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

BENTON, Judge.

A jury convicted Daryl Shurn of murder in the first degree, but could not agree on sentence. The trial court then sentenced him to death. After an evidentiary hearing, the post-conviction court overruled his Rule 29.15 motion. On appeal, Shurn raises 21 points of

error. This Court has exclusive appellate jurisdiction. *Mo. Const. art. V, § 3.* This Court affirms.

## I.

The state charged Shurn and William Weaver with first degree murder for the death of Charles Taylor. This Court reviews the facts in the light most favorable to the verdict. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984).

On July 6, 1987, Shurn and Weaver parked an Oldsmobile '98 outside of Taylor's apartment complex. After a confrontation at Taylor's door, Shurn and Weaver chased him behind the complex, and Taylor was shot. The evidence was unclear whether Shurn, Weaver, or both shot Taylor. Shurn and Weaver then returned to the car. Weaver then left the car and again went behind the complex. More shots were fired. Weaver returned to the car, and Shurn and Weaver drove away. After a chase, police officers apprehended Shurn and Weaver.

## II. Grand Jury Composition

Shurn's first complaint relates to the racial composition of the grand jury that indicted him. At trial, he filed a motion to dismiss and quash the indictment, which alleged that the grand jury resulted from systematic exclusion of non-whites, women, and those 21 through 34 years of age. Shurn argued that this violated his equal protection rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and article I, §§ 2, 10 and 18(a) of the Missouri Constitution. He now contends that the trial court erroneously denied his motion because too few African–Americans served on the grand jury.

■ To establish an equal protection claim in the context of grand jury selection, the defendant must prove that the grand jury selection procedure has "resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). The

defendant must first show membership in a cognizable racial group singled out for different treatment. *Id.* Second, the defendant must show an underrepresentation "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time." *Id.* The burden is on the defendant to show a substantial underrepresentation of his group in order to make a prima facie case, and shift the burden to the state. *Id.* at 495, 97 S.Ct. at 1280.

Shurn's evidence detailed the racial composition of seven grand jury pools, comprising 2,790 members with a known race. Of these, 186 members—or 6.67 percent—were African–American.

Shurn's evidence also detailed the racial composition of 10 grand juries, estimating that 11 blacks served on them. Because each grand jury has 12 jurors[1], the racial composition of the 10 grand juries was 9.17 percent black (Shurn asserts the percentage of black grand jurors as 8.33 percent). Thus, the percentage of black grand jurors exceeded the percentage of blacks in the pool.

■ Moreover, a representative number of blacks served on the grand juries. According to the stipulated census figures, blacks account for 11.26 percent of the population of St. Louis County. The disparity between the census of St. Louis County (11.26 percent black) and the racial composition of the grand juries referenced by Shurn (9.17 percent black) is insufficient to establish a prima facie equal protection claim under *Castaneda.* See, e.g., *Castaneda,* 430 U.S. at 495–96, 97 S.Ct. at 1280–81; *State v. Baker,* 636 S.W.2d 902, 909 (Mo. banc 1982), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983).

## III. Batson Challenge

■ Shurn next argues that the prosecutor's use of peremptory strikes violated his rights under the equal protection clause of the United States Constitution, which prohibits using peremptory challenges to exclude jurors on the basis of race. *Batson v. Ken-*

1. *Article I, § 16, Mo. Const.*

*tucky,* 476 U.S. 79, 90, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). To establish a claim under *Batson,* the defendant must object to the prosecutor's use of peremptory challenges as violating *Batson* and identify the cognizable racial group to which the stricken venirepersons belong. *State v. Parker,* 836 S.W.2d 930, 939 (Mo. banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). The state must then provide race-neutral explanations for the peremptory challenges. *Id.* If the prosecutor articulates an acceptable reason, the defendant must prove that the state's proffered reasons were merely pretextual and in fact racially motivated. *Id.*

After strikes for cause, the panel consisted of 48 potential jurors, including six blacks. The prosecutor peremptorily excluded four of the blacks: venirepersons Grider, Lenox, Webster, and Hughes. Shurn then made a timely *Batson* objection.

■ As proof of racial motivation, Shurn emphasizes the following statement by the prosecutor:

> Obviously, from the numbers, I could have attempted to remove all six blacks from the jury because I had more than enough preemptory [sic] challenges to accomplish that. I chose not to and instead used only four of my preemptory [sic] challenges to remove blacks and five to remove whites, leaving potentially at least, if Mr. Kirksey does not strike either remaining black, a jury with ten whites and two blacks. And that ratio, of course, I think from prior motions in this court and prior evidence in this court, is a greater percentage on this jury of black people than is in St. Louis County. So I don't feel that a prima facie case of a systematic exclusion is present.

Contrary to Shurn's claim, this statement does not per se establish discrimination. Instead, the prosecutor's failure to use all his challenges against blacks is relevant to show that race was not the motive for the use of peremptory strikes. *Id.* at 940.

■ The prosecutor explained: (1) that he struck venireperson Grider because she was a schoolteacher, was married to a pastor, and had earlier asked to be removed from the panel; (2) that he struck venireperson Lenox because she indicated she was reluctant to impose the death penalty unless the state proved that Shurn—and not his accomplice William Weaver—was the shooter, and he had requested the court to strike her for cause; (3) that he struck venireperson Webster because she "waffled" on whether she could impose the death penalty unless Shurn was the shooter, and seemed uninterested during voir dire; and (4) that he struck venireperson Hughes because she remarked, "we're not God," did not seem truthful, and showed hostility towards the state's case by nodding when another venireperson raised the issue of race.

■ The trial court has considerable discretion to determine the plausibility of the prosecutor's explanations and thus whether the defendant established that the prosecutor purposefully discriminated in using peremptory strikes. *Id.* at 934. "To be sufficient the explanation need only be race-neutral, reasonably specific and clear, and related to the particular case to be tried." *Id., citing Batson,* 476 U.S. at 98, 106 S.Ct. at 1724. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Parker,* 836 S.W.2d at 934, *citing Hernandez v. New York,* —— U.S. ——, ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).

■ The trial court found that Shurn did not establish a prima facie showing of discrimination under *Batson.* An appellate court will not overturn such a finding unless clearly erroneous. *Parker,* 836 S.W.2d at 939 n. 7, *citing Hernandez,* —— U.S. at ——, 111 S.Ct. at 1871, and *State v. Antwine,* 743 S.W.2d 51, 66 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). An examination of the prosecutor's reasons for striking the four venirepersons indicates that the trial court's decision was not clearly erroneous.

### IV. Trial Phase

#### A. Testimony that Taylor was a Potential Witness

■ The state, through the testimony of Detective Leyshock and assistant United

States attorneys Clark and Herzog, established that victim Charles Taylor was a potential witness in the trials of Shurn's brothers, Charles and Larry. Detective Leyshock and attorney Clark also testified that Shurn's brother Larry saw them interviewing Taylor at the federal courthouse during Larry's trial. Shurn objects to this evidence as irrelevant.

■ Evidence must be relevant to be admissible. *See State v. Mercer*, 618 S.W.2d 1, 9 (Mo. banc), *cert. denied*, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). Evidence "is relevant if it logically tends to prove a fact in issue or corroborates relevant evidence which bears on the principal issue." *Id.*

This evidence goes to motive. The state's theory was that Shurn murdered Taylor because Taylor was a potential witness in the trials of his brothers Charles and Larry.

■ Parties generally have wide latitude developing evidence of motive. *State v. Mallett*, 732 S.W.2d 527, 535 (Mo. banc), *cert. denied*, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). Where the defendant claims innocence, evidence of motive, or absence of motive, is relevant. *See State v. Stapleton*, 518 S.W.2d 292, 296 (Mo. banc 1975).

■ Trial courts have discretion to determine relevancy, and appellate courts will reverse that determination only upon a showing of abuse of discretion. *State v. Wood*, 596 S.W.2d 394, 402 (Mo. banc), *cert. denied*, 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980). Because the evidence regarding Taylor's status as a witness and Larry's knowledge of that status shows motive, the trial court did not abuse its discretion in admitting it.

**B. Testimony Relating to the Gun in Victim Taylor's Briefcase**

■ The state called Detective Cantwell, who testified that investigators found Taylor's briefcase at the crime scene. On cross-examination, defense counsel—over the state's relevancy objection—elicited the following testimony from Detective Cantwell:

Q: Okay. And I'd like to show you Defendant's Exhibit A. Would you look at that, please.

A: (The witness complies.)

Q: Do you recognize that photograph?

A: Yes, I do.

Q: Is that a blow-up of a photograph that you took?

A: Yes, it is.

Q: What does that photograph show?

A: This photograph shows this same briefcase being propped open with a Bible taken from inside and showing a .32 automatic inside.

Q: What is the condition of that .32 automatic?

A: It's probably in fair condition. The hammer is cocked.

Q: The hammer is cocked? Was the weapon loaded at the time that you found it?

A: At the time I found it, it was determined to be loaded. I did not make that determination though.

The state later called Detective Leyshock, who testified—over defense objection—that two days before the murder, Taylor stated that he was going to start carrying a gun because he had heard the Shurns were going to kill him. The trial court instructed the jury to limit its consideration of the testimony only to show Taylor's state of mind, and not to consider it for its truth. The state also called Taylor's wife, who testified that Taylor carried a gun after hearing he was in danger, that Shurn's brother Larry had given Taylor a thumbs-down gesture at the courthouse during Larry's trial, and that the "word out on the street" was that Shurn was going to kill him. The court again instructed the jury to consider the testimony only as to Taylor's state of mind and not for its truth. Shurn now contends that the trial court erred in allowing the testimony regarding Taylor's state of mind because it was hearsay and irrelevant.

■ A hearsay statement is any out-of-court statement used to prove the truth of the matter asserted. *State v. Harris*, 620 S.W.2d 349, 355 (Mo. banc 1981). Hearsay

statements are generally inadmissible. *See State v. Summers,* 362 S.W.2d 537, 543 (Mo. 1962).

Citing *State v. Lingar,* 726 S.W.2d 728 (Mo. banc), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987), the state argues that Shurn "opened the door" to this evidence. In *Lingar,* this Court stated that "where the defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue the defendant injects." *Id.* at 734–35 (*citing State v. Starr,* 492 S.W.2d 795, 799 (Mo. banc 1973)).

In *Starr,* defense counsel asked a detective—on cross-examination—where he learned that the murder weapon was in the defendant's basement. *Id.* at 799. The detective responded that "James Goodlow" had given him the information. *Id.* On re-direct, the prosecutor asked the detective whether Goodlow had explained how he knew the weapon was in the defendant's basement. *Id.* Defense counsel made a hearsay objection, which the trial court overruled. *Id.* at 800. On appeal, this Court held that the trial court did not err in overruling the objection, because defense counsel had first injected the issue into the case. *Id. Starr* and *Lingar* thus rely on the doctrine of curative admissibility: where the defendant introduces inadmissible evidence, the state may then use evidence—even if inadmissible—to explain or counteract any negative inference raised by the defendant's inadmissible evidence. *1 Wigmore Evidence* § 15 (Tillers rev. 1983).

Citing *Lingar* the state contends that Shurn injected the issue of the gun into the case, raising a negative inference that Taylor—not Shurn nor his accomplice William Weaver—was the aggressor. However, the state misreads *Lingar. Lingar*—and the curative admissibility doctrine—does not apply to this case, because Shurn's evidence that Taylor possessed a gun was admissible to show that Taylor was the aggressor. *Wharton's Criminal Evidence* § 167 (1985).

■ However, the statements by Detective Leyshock and Ms. Taylor were admissible under the state-of-mind exception to the hearsay rule. A victim's statements of fear of the defendant—where relevant and not unduly prejudicial—are admissible under the state-of-mind exception to the hearsay rule. *State v. Boliek,* 706 S.W.2d 847, 850 (Mo. banc), *cert. denied,* 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986); *see also* Wigmore on Evidence § 1730 at 148 (1976). Shurn contends that the testimony about Taylor's state of mind was inadmissible because it was irrelevant.

■ The victim's statements of fear are relevant where the defendant argues self-defense. *See United States v. Brown,* 490 F.2d 758, 768–69, 773–74 (D.C.Cir.1973); *People v. Armendariz,* 37 Cal.3d 573, 209 Cal.Rptr. 664, 671, 693 P.2d 243, 251 (1984); *State v. Langley,* 354 N.W.2d 389, 398–99 (Minn.1984). Shurn did not raise self-defense, but did argue that Taylor was the aggressor and that Weaver reacted by shooting Taylor. Nevertheless, a self-defense theory and Shurn's theory both contend that the victim was the aggressor. Taylor's fear of Shurn was therefore relevant to whether and how Taylor would be an aggressor in response to Shurn and an accomplice.

Shurn argues that he did not raise this issue until after Detective Leyshock and Ms. Taylor testified. However, when the issue of the gun-in-the-briefcase first arose—just before the above-quoted transcript excerpt—Shurn's counsel specifically stated that his "theory in the case is going to be that this man [Taylor] had this weapon and this man was going to use this weapon before he was killed." Defense counsel did not request a self-defense or defense-of-others instruction, but these instructions would have been inconsistent with Shurn's evidence. Shurn testified that Taylor was the aggressor and that *Weaver*—not Shurn—reacted to Taylor's reaching for the gun. During opening argument (deferred until the close of the state's evidence), defense counsel stated that when confronted by Shurn and Weaver, Taylor "reached in his briefcase and began to pull this gun out and it was cocked." During closing argument, defense counsel further stated:

Mr. Westfall [the prosecutor] finally got to the probably major piece of evidence in this case, the gun in the briefcase. That's the way he described it. Well, he [the prosecutor] knows he's got to deal with that gun in that briefcase. He cannot overlook it. And what does he tell you about that gun in the briefcase? Well, this man [Taylor] is walking around with a cocked pistol in his briefcase with a round in the chamber with an automatic. I don't know how many of you know anything about guns, but you don't walk around with a cocked automatic in your briefcase with a round in the chamber. You just don't do that. You could drop the briefcase and the gun could go off, or you might shoot yourself in the foot. You don't do that.

Charles Taylor had that gun cocked in that briefcase because he had tried to get it out and he was stopped by William Weaver as he tried to get that gun out of the briefcase. Daryl told you that while he was talking to Charles Taylor, Taylor came out with this briefcase and some other objects in his hand. Well, Mr. Westfall wants to make you believe that Charles Taylor had to be a juggler in order to get to this briefcase. All you've got to do is pop it open and reach in (demonstrating) and start to pull that gun out. And then William Weaver jumps over, pushes you in your chest, drops you back. You drop that gun and the chase is on. Because Weaver has his gun out.

Shurn's counsel injected the issue that Taylor was the aggressor. Taylor's fear of Shurn was therefore relevant, and the trial court properly allowed the state to introduce evidence of Taylor's state-of-mind for carrying the gun.

## C. Admissibility of Photograph

The state introduced Exhibit 15, a photograph depicting Taylor's corpse at the crime scene. Defense counsel objected to the photograph as unduly prejudicial and inflammatory. The trial court overruled the objection. After one of the alternate jurors became ill while viewing various photographs, defense counsel moved for a mistrial. However, defense counsel withdrew the motion before the court ruled on it.

Shurn contends that the trial court erred in admitting the photograph and in denying defense counsel's motion for a mistrial. Because defense counsel withdrew the motion for a mistrial, there is no error.

Trial courts have broad discretion in admitting photographs. *State v. Isa*, 850 S.W.2d 876, 890 (Mo. banc 1993). "Although gruesome, photographs are generally admissible to assist the jury better to understand the testimony of a witness, to show the nature and location of the wounds, depict the location and condition of the body, or to establish any other element of the State's case." *Id.* Dr. Ganter, who performed Taylor's autopsy, testified on behalf of the state with regard to Taylor's wounds. The prosecutor later introduced Exhibit 15 during the testimony of Detective Cantwell. Because the photograph shows the nature and location of Taylor's wounds, the trial court did not abuse its discretion.

## D. Cross-examination of Shurn

During cross-examination, the prosecutor asked Shurn whether he met with Tommy Mitchell and Willie Greer prior to the murders, in order to discuss using Weaver to kill Taylor. Defense counsel objected to this line of questioning as beyond the scope of direct examination. Shurn now contends that cross-examination about these conversations distracted the jury and injected "arbitrary factors" into the case.

Trial courts have broad discretion to control cross-examination. *State v. Leisure*, 749 S.W.2d 366, 378 (Mo. banc 1988), *cert. denied*, — U.S. —, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). In *State v. Dunn*, 577 S.W.2d 649, 653 (Mo. banc 1979), this Court held that the state cannot ask the defendant about unrelated criminal misconduct. Citing *Dunn*, Shurn contends that the conduct referenced by the state is collateral and thus should not have been admitted. However, *Dunn* does not apply to this case. The conduct (planning Taylor's murder) is related to the crime for which Shurn was charged (Taylor's murder).

Shurn denied any involvement in the murder of Taylor, including asking Weaver to kill Taylor. The state asked Shurn about Mitchell and Greer in order to impeach Shurn, and the trial court properly permitted the questioning for this purpose.

### E. Closing Argument—Trial Phase

Shurn claims that much of the prosecutor's closing argument is improper. The standard of review for alleged error in closing argument depends upon whether defense counsel objects. Where defense counsel objects, appellate courts will reverse the trial court's decision with regard to closing argument only upon a showing of abuse of discretion by the trial court. *State v. McDonald,* 661 S.W.2d 497, 497 (Mo. banc 1983), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). However, where defense counsel does not object, appellate courts may review only for plain error. *Rule 30.20.* Plain error review mandates reversal only if the error results in manifest injustice. *Id.* Plain error review also requires that the argument have a decisive effect on the jury's determination. *State v. Whitfield,* 837 S.W.2d 503, 511 (Mo. banc 1992).

Defense counsel failed to object to most of the prosecutor's comments. Citing *State v. McMillin,* 783 S.W.2d 82, 97–98 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990), the state requests this Court to review alleged errors in closing argument only where defense counsel objected. This Court may review closing argument claims for plain error, if manifest injustice is legitimately raised, and the argument decisively affected the jury. *See, e.g., State v. Debler,* 856 S.W.2d 641, 651 (Mo. banc 1993).

Shurn first complains that the prosecutor improperly commented on the evidence. The prosecutor stated, "You could be a juror on a hundred cases and I could try a thousand cases and you would be hardpressed after you see a set of facts where guilt is more obvious on their face." Defense counsel did not object. However, this Court has consistently held such statements do not constitute reversible error. *See, e.g., State v. Jones,* 491 S.W.2d 271, 272–73 (Mo.1973).

Shurn next contends that the comment that Shurn was "streetwise" and thus knew that Taylor was a witness in his brothers' trials was improper closing argument. Defense counsel did not object. The prosecutor may make reasonable inferences from the evidence. *McDonald,* 661 S.W.2d at 506. The evidence indicates that the prosecutor's statement was a reasonable inference: Larry Shurn saw federal prosecutors interviewing Taylor at the federal courthouse during Larry's trial; Shurn testified that Larry mentioned—after Larry's trial and before Charles' trial—"something about" Taylor's testifying; and Taylor was active in Larry and Charles's drug business.

Third, Shurn argues that the prosecutor's statements that Shurn participated in the family drug business were improper argument. The prosecutor referred to the Shurns as being a "drug family," involved in "drug empires," and stated that at least one of the Shurns was a high-level drug dealer. Defense counsel did not object.

Most of these statements implicate Shurn's family, not Shurn himself. The evidence indicated that two of Shurn's brothers were convicted of drug-related offenses and that Shurn himself was convicted of possession of heroin, and Shurn testified that his brothers were involved in a large-scale drug business. The prosecutor's statements regarding the Shurn family were reasonable inferences from the evidence.

Next, Shurn complains about the prosecutor's statement that he could have produced more witnesses but "enough is enough." Defense counsel did not object. A prosecutor may not make statements that imply a knowledge of facts not before the jury. *Whitfield,* 837 S.W.2d at 511. This statement refers to a knowledge of facts not in evidence. However, the statement alone does not rise to a level of manifest injustice. Taken in context, the statement related to uncalled witnesses who saw Shurn at the crime scene and heard the shots. Shurn's testimony corroborated that he was at the scene and a shooting occurred. The prosecutor's statements that he could have produced

more witnesses on this point did not prejudice Shurn.

■ Fifth, Shurn attacks statements by the prosecutor that allegedly assert the truth of out-of-court statements. The prosecutor stated that Taylor told Detective Leyshock that he feared the Shurns, and that Taylor was "right" in fearing the Shurns because "he's buried now." Defense counsel did not object.

The prosecutor's comments do not rise to the level of manifest injustice. Immediately before the statement that Shurn attacks, the prosecutor stated, "I'm talking about his [Taylor's] state of mind," and "I'm not arguing the truth of his [Taylor's] remarks." Detective Leyshock's testimony was admissible to show Taylor's state of mind, and the prosecutor could reference the state of mind.

■ Sixth, Shurn contends that the prosecutor "hurled epithets" by stating that if Taylor had shot Weaver and Shurn, "there would be cause for celebration because two pieces of scum would be dead." Defense counsel did not object.

"As a general rule, especially during the guilt phase, the prosecutor should refrain from *ad hominem* attacks on the defendant and other irrelevant statements that only inflame the jury." *Id.* at 511. However, no manifest injustice resulted, because Shurn does not show that this isolated insult decisively affected the jury.

■ Seventh, Shurn argues that the prosecutor denied him his Sixth Amendment right to defend the charge by referring to his note-taking throughout the trial. Defense counsel did not object. Taken in context, the prosecutor was arguing that Shurn's testimony was not true and that he had the opportunity to make up a story to conform to the evidence. The prosecutor may comment on the credibility of the defendant in this manner. *See State v. Underwood,* 642 S.W.2d 658, 660 (Mo.App.1982).

■ Next, Shurn complains about statements by the prosecutor during rebuttal. Parties have considerably more leeway when the argument is retaliatory. *State v. Mease,* 842 S.W.2d 98, 109 (Mo. banc 1992).

The prosecutor stated that Taylor was a "front man" for the Shurns. Defense counsel did not object, and in fact stated during closing argument that Taylor "had been fronting" for the Shurns.

■ The prosecutor also stated that Taylor faced jail if he did not testify against Shurn's brothers. Defense counsel did object to this statement. Defense counsel himself stated, in closing argument, that Taylor was testifying to get the Shurns "out of the way," and benefit by keeping the property that the Shurns had titled in Taylor's name. The prosecutor may rebut the defense explanation with an alternative supported by the evidence, or an inference from the evidence. Because Taylor was subpoenaed for the federal trial of at least one of Shurn's brothers, the evidence supports the prosecutor's argument.

Shurn also takes exception to the following comment by the prosecutor during rebuttal: "[I]f a guy like this [Shurn] doesn't get found guilty and either put away for life or sent to the gas chamber, then what's he [Detective Leyshock] doing it for? Because one false move and he gets sliced by the razor." Shurn complains that this implies that he will kill police officers. Shurn misconstrues the statement. The prosecutor was emphasizing the credibility of Detective Leyshock, not that Shurn will kill police officers.

■ Finally, Shurn complains about the prosecutor's statement, "I do have the strongest evidence." Defense counsel objected to this statement; the trial court sustained the objection and directed the jury to disregard the comment. This was a sufficient response because this statement did not result in an unfair trial to Shurn. *State v. Callies,* 663 S.W.2d 350, 351 (Mo.App.1983).

**F. Instructions**

**1. The Verdict Director**

■ Instruction 6, the verdict director, stated:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about July 6, 1987, in the County of St. Louis, State of Missouri, the defendant and/or William Weaver caused the death of Charles Taylor by shooting him, and

Second, that it was the defendant's purpose to cause the death of Charles Taylor, and

Third, that defendant did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the commission of that murder in the first degree, the defendant acted together with or aided William Weaver in committing that offense, then you will find the defendant guilty under Count I of murder in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the first degree.

Arguing that this instruction was erroneous, Shurn points to Note on Use 7(a) to MAI–CR 3d 304.04:

Where the evidence shows the conduct of the offense was committed *entirely* by someone other than the defendant and the sole basis for defendant's liability is his aiding the other person or persons ... then all the elements of the offense should be ascribed to the other person or persons and not to the defendant. (emphasis added)

Contrary to Shurn's claim, the evidence is not clear that Weaver alone murdered Taylor. Both Shurn and Weaver chased Taylor behind the apartment complex; one witness testified that she saw both Shurn and Weaver running with their hands up as if both were carrying guns; persons living in the complex heard gunshots; Shurn and Weaver returned to the car; Weaver then went behind the complex again; witnesses heard more shots; Weaver returned to the car, which left the complex. Because it was un-

clear whether Shurn or Weaver, or both, shot Taylor, the trial court correctly refused to use Note on Use 7(a).

## 2. Instruction 11

■ Instruction 11, based upon MAI–CR 3d 313.48, stated that if the jury could not agree on Shurn's punishment, the trial court would do so. Shurn claims that this instruction violates the Eighth Amendment, citing *Caldwell v. Mississippi*, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985). This Court again rejects this argument. *See, e.g., State v. Ervin*, 835 S.W.2d 905, 926 (Mo. banc 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

## 3. Defining "Reasonable Doubt"

■ In both phases, the court submitted instructions—patterned after MAI–CR 3d 302.04—that defined "reasonable doubt" as a doubt that leaves jurors "firmly convinced" of the defendant's guilt. Shurn complains that this definition violated his due process rights under the Fourteenth Amendment to the United States Constitution, citing *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). This Court again holds that the definition is constitutional. *Ervin*, 835 S.W.2d at 924.

### V. Penalty Phase

The state argues that many of the errors occurring during the penalty phase of the trial could not have prejudiced Shurn because the judge, not the jury, sentenced Shurn. In *McMillin*, 783 S.W.2d at 96, this Court stated, "Where a judge, rather than a jury, is the trier of fact, the reviewing court presumes that inadmissible evidence is not prejudicial." In *State v. Six*, 805 S.W.2d 159, 167 (Mo. banc), *cert. denied*, —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991), this Court stated that the defendant's argument was "further weakened by the fact that the trial judge sentenced [him] and is presumed not to have been affected in sentencing by arguably prejudicial evidence."

■ *McMillin* and *Six* thus hold that trial courts are presumed not to consider improper evidence when sentencing defen-

dants. Errors in front of the jury can prejudice the defendant even where the judge sentences the defendant. In the penalty phase, the jury has a choice between two sentences: death and life imprisonment. Errors during the penalty phase can prejudice the defendant by preempting the jury from choosing the "life" alternative. *See Espinosa v. Florida*, — U.S. —, —, 112 S.Ct. 2926, 2929, 120 L.Ed.2d 854 (1992). Thus, this Court reviews alleged errors during the penalty phase, even if the judge reaches the final sentence.

## A. Cross-examination of Jollie Shurn

█ Jollie Shurn, the defendant's uncle, testified for the defense during the penalty phase. Defense counsel inquired, "Have you ever known him to be a man given to violence, either in his youth or as a man today?" Jollie Shurn flatly answered, "No."

On cross-examination, the prosecutor asked Jollie Shurn if he was aware that the defendant had been arrested for murder in 1981, first degree assault in 1981, and first degree assault and robbery in 1981. Defense counsel objected, but the trial court overruled the objection. Shurn claims that the trial court erroneously permitted this cross-examination.

The cross-examination was relevant and clearly within the scope of the direct examination. Previous death penalty cases have permitted such cross-examination during the penalty phase. *State v. Sweet*, 796 S.W.2d 607, 614 (Mo. banc 1990), *cert. denied*, 499 U.S. 932, 111 S.Ct. 1339, 113 L.Ed.2d 270 (1991); *State v. Byrd*, 676 S.W.2d 494, 505 (Mo. banc 1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985).

█ Shurn also argues that the state violated his right to due process by failing to disclose the arrests. However, the state has no duty to disclose a defendant's prior arrests before cross-examining about them. *See, e.g., State v. Brock*, 778 S.W.2d 13, 14–15 (Mo.App.1989).

## B. Cross-examination of Daryl Shurn

█ On direct examination, Shurn denied murdering Taylor. On cross-examination,

the prosecutor asked Shurn about the empty casings on the floorboard of the getaway car, whether Taylor was killed with a .357 Magnum, and about the meeting with Greer and Mitchell to plan the murder. Shurn claims that the trial court erred by permitting this cross-examination.

█ The state may cross-examine a defendant in detail as to matters generally referred to in direct examination. *State v. Murphy*, 592 S.W.2d 727, 731 (Mo. banc 1979). Moreover, the jury may consider the nature and circumstances of the crime during the penalty phase. *Six*, 805 S.W.2d at 166. Therefore, the trial court properly permitted the prosecutor to ask Shurn about the facts of the murder.

## C. Closing Argument—Penalty Phase

█ Shurn claims several of the prosecutor's comments during closing argument in the penalty phase were improper. Both parties have wide latitude in arguing during the penalty phase of a first-degree murder case. *McDonald*, 661 S.W.2d at 506.

█ During closing argument during the penalty phase, the prosecutor stated that "there are certain crimes that deserve the death penalty in our community. And if this isn't one of them, I don't know what would be." Later, the prosecutor stated that, as the top law enforcement officer in the county, he had decided to *ask* for the death penalty, but that the jury needed to tell him whether he was wasting his time. Defense counsel did not object to any of these statements. These statements, paralleling those made during the guilt phase, do not rise to the level of manifest injustice. *Jones*, 491 S.W.2d at 273; *Mease*, 842 S.W.2d at 109.

█ Shurn also complains that the prosecutor personalized the case to the jury by asking, "what if it [a witness to the trials of Shurn's brothers] were some young girl or some older woman or a police officer?" Defense counsel objected.

█ A prosecutor cannot personalize a closing argument to the jury. *State v. Rasberry*, 452 S.W.2d 169, 172 (Mo. 1970); *State v. Durbin*, 835 S.W.2d 323, 326 (Mo.App.

1992). However, because the references are not personalized to the members of the jury, the prosecutor's argument is not impermissible personalization. *See Rasberry*, 452 S.W.2d at 172–73.

Third, Shurn claims that the following comment improperly likened the jury's decision to a soldier killing in a war:

> You know, it's not always wrong to kill. It's maybe always difficult to kill; but if you kill in self-defense, that's not wrong. If you kill in a just war, that is not wrong. It's right. If somebody is going to kill your child and you have a chance to kill them to prevent it, would you do it? Of course. Kill Daryl Shurn.

Contrary to Shurn's claim, the prosecutor was not comparing the jury to a soldier, but invoking situations—like sentencing a defendant to death—where it is legal to take a human life. (As to Shurn's argument that the just-quoted reference to "kill your child" is personalization, the context is clear that Shurn is not the "somebody" to which the prosecutor refers.)

Fourth, Shurn complains that the prosecutor stated that Shurn was more deserving of death than Charles Manson. Again, Shurn overstates the prosecutor's argument. The prosecutor stated, "The Charles Mansons of the world, you're not going to deter them. . . . This is the kind of crime that can be deterred." In fact, the prosecutor was, in a backhanded manner, stating that Shurn was better than Manson.

▪ Fifth, Shurn contends that the prosecutor argued outside the record that Shurn did not care about the impact of drugs on children and that if Taylor had begged for his life Shurn would have laughed. Defense counsel did not object to either statement. The evidence did not support either statement. While error may have occurred, the passing comments did not have a decisive effect on the jury, and are not a manifest injustice. *Whitfield*, 837 S.W.2d at 511.

▪ Finally, Shurn complains that the prosecutor erroneously invoked the Bible by stating, "I'm asking you [the jury] to take an eye for an eye," while referring to the Old Testament. Defense counsel did not object.

Parties should avoid excessive references to the Bible. *Debler*, 856 S.W.2d at 656. This isolated reference does not rise to the level of plain error.

Shurn argues that the prosecutor's penalty-phase argument is equivalent to that in the case of *Newlon v. Armontrout*, 693 F.Supp. 799 (W.D.Mo.1988), *affirmed*, 885 F.2d 1328 (8th Cir.1989), *cert. denied*, 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990). In fact, the argument here is less objectionable than that in *Newlon*. In *Newlon*, the prosecutor made five types of improper statements during the penalty phase. First, the prosecutor "expressed his personal belief in the propriety of the death sentence and implied that he had special knowledge outside the record." *Newlon*, 885 F.2d at 1335. The prosecutor stated that he had never asked for the death penalty before Newlon and had never seen a man who deserved it more. *Id.* at 1340. In this case, the prosecutor stated that "there are certain crimes that deserve the death penalty in our community. And if this isn't one of them, I don't know what would be." This argument, emphasizing the severity of murdering a witness, does not rise to the level of *Newlon*.

Second, the prosecutor in *Newlon* emphasized his position of authority, stating that he was seeking the death penalty as the top law enforcement officer in the county. *Id.* at 1342. In this case, the prosecutor stated that he was the top law enforcement officer in the county and *that the jury must tell him whether he should be seeking the death penalty*. This does not imply that the prosecutor had already made the decision required of the jury.

Third, the prosecutor in *Newlon* attempted to link the defendant with several well-known mass murderers. The prosecutor mentioned Charles Manson, Richard Speck, and the "Sons of Sam." *Id.* True, in this case, the prosecutor mentioned Manson. However, the prosecutor was not "linking" Shurn to Manson, but stating that Shurn was *unlike* Manson.

Fourth, the prosecutor in *Newlon* "appealed to the jurors' personal fears and emotions." The prosecutor stated, "if Rayfield

[Newlon, the defendant] was going to harm your child, would you kill him?" *Id.* The prosecutor also gave a vivid description of the victim. *Id.* Shurn argues that the prosecutor in this case appealed to the jurors' personal fears and emotions with the following statement: "If somebody is going to kill your child, and you have a chance to kill them to prevent it, would you do it?" This comment was not an appeal to the jurors' personal fears and emotions, but an example of a situation in which it might be "legal" to kill. The prosecutor's comment did not refer to Shurn.

Finally, the prosecutor in *Newlon* repeatedly asked the jurors to "kill" the defendant. *Id.* This statement came just after the prosecutor asked the jury whether they would kill the defendant if he "was going to harm your child." *Id.* In this case, the prosecutor did once request the jury to "kill" Shurn. However, this statement did not follow a plea to the jurors' personal fears, and thus does not equal *Newlon.*

In sum, the prosecutor's closing argument in this case is not like that in *Newlon.* The Eighth Circuit in *Newlon* reviewed the penalty-phase argument in light of the totality of the circumstances. *Id.* at 1338. Taking the prosecutor's argument as a whole, the prosecutor's argument in this case does not mandate reversal.

### D. Instructions

#### 1. Jury Confusion

■ The jury instructions required a verdict of life imprisonment if the jury did not unanimously find at least one aggravating circumstance. Shurn argues that the jury misunderstood the instructions and thus believed that since they could not unanimously find an aggravating circumstance, they must report that they could not agree on punishment.

The plain language of the instructions refutes this point. Instruction 6 (detailing aggravating circumstances) stated:

Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing circumstances exists, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Division of Corrections without eligibility for probation or parole.

Instruction 8 had a similar provision. Instruction 9 stated that if the jury unanimously finds that one or more mitigating circumstances outweigh any aggravating circumstances, the jury should set punishment for life. Finally, Instruction 11 stated that if the jury were unable to agree upon punishment, "the foreman will sign the verdict form so stating."

■ Juries presumptively follow their instructions. *State v. Griffin,* 756 S.W.2d 475, 488 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). Contrary to Shurn's claims, the instructions were not ambiguous. Moreover, this Court has repeatedly rejected the argument that the instructions were unclear whether the jury could not decide the punishment or in fact had decided upon life imprisonment. *Id.*

#### 2. Instruction 6

Instruction 6 stated:

In determining the punishment to be assessed under Count I against the defendant for the murder of Charles Taylor, you must first unanimously determine whether one or more of the following aggravating circumstances exist.

. . . .

2. Whether Charles Taylor was a potential witness in past or pending prosecutions of Charles Shurn and/or Larry Shurn in federal court and was killed as a result of his status as a potential witness.

■ This instruction follows the statute on aggravating circumstances and the pattern instruction. *§ 565.032.2(12) RSMo Supp. 1989; MAI–CR 3d 313.40.* Shurn did not object to this instruction; this Court reviews this claim for plain error. *Rule 30.-20.*

■ Shurn contends that Instruction 6 did not require that the jury find that *Shurn* killed Taylor because of Taylor's status as a potential witness. In *State v. Isa,* 850 S.W.2d 876, 902–03 (Mo. banc 1993), this

Court held that statutory aggravating circumstances must focus on the defendant's individual state of mind. In *Isa*, the trial court erroneously submitted an instruction that authorized finding an aggravating circumstance based on the conduct of the defendant's spouse. *Id.* at 902.

There is no plain error. In *Isa*, the erroneous instruction named the defendant's spouse. Instruction 6 does not name Weaver. The jury convicted Shurn of first degree murder, finding that he purposefully caused Taylor's death. Instruction 6 clearly focused on Shurn's state of mind.

### 3. Instruction 9

Shurn complains that the trial court plainly erred by giving the jury penalty phase Instruction 9, based upon MAI–CR 3d 313.44. Citing *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), Shurn contends that the instruction authorizes cruel and unusual punishment by requiring the jury unanimously to find each mitigating circumstance to be weighed against aggravating circumstances. This Court has repeatedly rejected this argument. *See Debler*, 856 S.W.2d at 655.

### E. Aggravating Circumstance

█ Shurn contends that the trial court erred in sentencing him to death because the state did not prove the aggravating circumstance, that Shurn murdered Taylor because he knew Taylor was a potential witness.

Section 565.032.2 RSMo Supp.1992 states an aggravating circumstance for a murder in the first degree:

> (12) The murdered individual was a witness or potential witness in any past or pending investigation or past or pending prosecution, and was killed as a result of his status as a witness or potential witness.

The evidence must support the aggravating circumstance before the jury or judge may consider it. *Section 565.032.1(1) RSMo Supp.1992.* The trial court found, beyond a reasonable doubt, that Taylor was killed because of his status as a witness or potential witness, and sentenced Shurn to death.

The state's evidence implied that Shurn knew Taylor was a potential witness in the trials of his brothers Charles and Larry: Larry saw federal prosecutors interviewing Taylor at the federal courthouse during Larry's trial; Shurn testified that his brother Larry mentioned—after Larry's trial—something about Taylor being an available witness;[2] Taylor was active in Charles and Larry's drug business; Detective Leyshock testified that he heard that Charles or Larry told Shurn that Taylor was a potential witness.

█ Circumstantial evidence is sufficient to prove aggravating circumstances. *See, e.g., State v. Davis*, 814 S.W.2d 593, 606 (Mo. banc 1991), *cert. denied*, — U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992) (jury could reasonably infer that defendant murdered victim because she was a witness in a pending prosecution, which was one of two aggravating circumstances). In this case, sufficient circumstantial evidence supported the aggravating circumstance.

### F. Timing of Trial Court's Sentence

█ The jury convicted Shurn on March 26, 1988, and initially set sentencing for May 6, 1988. On May 18, the court reset sentencing for July 22, 1988; the court later continued sentencing until September 13, 1988. Citing *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983), Shurn complains that the trial court delayed sentencing until after accomplice Weaver's trial, in violation of the Eighth Amendment requirement of individualized sentencing. *See also Enmund v. Florida*, 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982).

---

**2.** Shurn testified on direct examination:
Q: Did your brother [Charles Shurn] ever discuss with you the possibility that Charles Taylor might testify against him?
A: No, sir.
Q: Did Larry ever discuss that fact with you?

A: No. Larry only mentioned the fact that after that—after his case was over with and he more or less said something about—we was at at [sic] my mother's house one day and he was saying something about it then.

There is no indication that the trial court considered Weaver's case in sentencing Shurn, except for its acknowledgment at the beginning of the trial court's sentencing of "the necessity of delaying this sentencing until following the trial of the Weaver case." Otherwise, the court did not refer to Weaver, or any evidence from Weaver's trial, in sentencing Shurn.

Trial counsel stated at the post-conviction hearing that he did not file a motion to have Shurn sentenced because he did not want to rush the judge. Specifically, trial counsel reasoned that if Weaver received life imprisonment, the trial court would be more reluctant to sentence Shurn to death. The motion court held that this was a strategic decision by defense counsel.

■ This Court presumes that judges do not consider improper evidence when sentencing defendants. See *McMillin*, 783 S.W.2d at 96. Shurn does not overcome this presumption by citing the time delay and the comments by the trial judge. Point denied.

## G. Proportionality Review

■ This Court examines capital murder and first degree murder cases in which the sentencer considers death and life imprisonment to determine whether the sentence is proportionate to other cases. *Section 565.-035.3(3) RSMo 1986; Six*, 805 S.W.2d at 169.

This Court has approved a sentence of death where the defendant murdered the victim because of the victim's status as a witness: *Davis*, 814 S.W.2d at 606 (one of two aggravating circumstances was that the defendant murdered the victim because she was a witness in a pending prosecution); *Six*, 805 S.W.2d at 169 (aggravating circumstance was that the defendant killed the victim because the victim could identify him); *State v. Petary*, 781 S.W.2d 534, 544 (Mo. banc 1989), *vacated and remanded*, 498 U.S. 973, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990), *reaffirmed* 790 S.W.2d 243 (Mo. banc), *cert. denied*, 498 U.S. 973, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990) (aggravating factor that the defendant killed the victim because of the victim's status as a witness); *State v. Boliek*, 706 S.W.2d 847, 851 (Mo. banc), *cert. denied*, 479 U.S.

903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986) (aggravating circumstance that the defendant killed the victim intending to eliminate a witness); *State v. Gilmore*, 661 S.W.2d 519, 525 (Mo. banc 1983), *cert. denied*, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984) (aggravating circumstance that the defendant murdered the victim to prevent the victim from testifying in judicial proceeding); *State v. Williams*, 652 S.W.2d 102, 113 (Mo. banc 1983) (the defendant murdered the victim to eliminate the victim as a witness); and *State v. Blair*, 638 S.W.2d 739, 758–60 (Mo. banc 1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983) (upheld capital murder conviction of a defendant paid by a third party to murder the victim because the victim was a potential witness).

Shurn cites *State v. Malady*, 669 S.W.2d 52 (Mo.App.1984), in which the defendant and another murdered the victim because the victim testified before a grand jury. Malady received a life sentence. *Id.* at 53. However, Malady was a passive accomplice: the victim testified before a grand jury investigating one Lawrence Rorie; the victim told Rorie's girlfriend about his testimony; the victim was murdered the same day; the defendant admitted that he and Rorie were with the victim when he was killed and that Rorie accidentally shot the victim during a struggle. Here, Shurn, unlike the defendant in *Malady*, was not a passive accomplice.

Shurn also claims that death is a disproportionate sentence because he was not the actual shooter. He cites *State v. Coleman*, 660 S.W.2d 201 (Mo.App.1983), where the defendant received a life sentence for the murder of a potential witness.

*Coleman* is substantially different from this case. In *Coleman*, the murdered victim was a witness to the criminal conduct of John Morgan and Doyle Williams. *Id.* at 204–05. However, Coleman's involvement in the murder was much less than Shurn's: Coleman drove the victim to the scene of the crime, left the victim with Morgan and Williams, and departed the crime scene; Morgan and Williams committed the physical act that caused the victim's death, out of Coleman's presence. In contrast, Shurn admitted being at the murder scene. Moreover, the evi-

dence is unclear whether Shurn, Weaver, or both shot Taylor. One witness testified that she saw both Weaver and Shurn running with their hands together as if both were carrying guns.

■ *Malady* and *Coleman* are distinguishable. Moreover, proportionality review is intended to provide a safeguard against the freakish and wanton application of the death penalty. *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993). "The issue when determining the proportionality of a death sentence is not whether any similar case can be found in which the jury imposed a life sentence, but rather, whether the death sentence is excessive or disproportionate in light of 'similar cases' as a whole." *State v. Mallett*, 732 S.W.2d 527, 542 (Mo. banc), *cert. denied*, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). Neither the Eighth nor Fourteenth Amendment requires this Court to reweigh mitigating and aggravating evidence. *Ramsey*, 864 S.W.2d at 328.

■ This Court concludes that the penalty imposed in this case is not excessive nor disproportionate to the penalties imposed in similar cases, considering the crime, the evidence, and the defendant.

### H. Constitutionality of Death Penalty

Shurn contends that the trial court erred in overruling his motion to quash the indictment and dismiss his case because of the unconstitutionality of the death penalty in Missouri.

First, Shurn argues that the death penalty is unconstitutional because this Court does not engage in proportionality review as required by § 565.035.3(3) RSMo 1986. This Court has repeatedly rejected this claim. *See, e.g., State v. Wacaser*, 794 S.W.2d 190, 196 (Mo. banc 1990).

Second, Shurn argues that the death penalty is unconstitutional because chapter 565 RSMo vests prosecutors with unrestricted discretion in determining whether to seek the death penalty. This Court has repeatedly rejected this claim. *See, e.g., Whitfield*, 837 S.W.2d at 515.

Third, Shurn contends that the death penalty violates his rights to due process, equal protection, and freedom from cruel and unusual punishment because it does not serve a legitimate governmental interest. Again, this Court rejects this oft-raised claim. *Id.*

### VI. Post–Conviction Proceeding

### A. Instructional Error

■ Shurn complains that the motion court erred in denying post-conviction relief on his claims of error regarding the jury instructions. However, allegations of instructional error are beyond the scope of Rule 29.15 and are for direct appeal. *See, e.g., Six*, 805 S.W.2d at 167–68.

### B. Ineffective Assistance of Trial Counsel

■ Shurn claims his trial counsel was ineffective in various ways. To prove ineffective assistance of counsel, a defendant must show that his trial counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, and that the failure prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To prove prejudice, the movant must show a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Ervin*, 835 S.W.2d at 929, citing *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Moreover, the movant must overcome the presumption that counsel is competent. *Debler*, 856 S.W.2d at 652, citing *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Reasonable trial strategy is not a ground for ineffective assistance of counsel. *Ervin*, 835 S.W.2d at 931.

■ The motion court overruled Shurn's Rule 29.15 motion raising claims of ineffective assistance of counsel. This Court reviews the motion court's findings of fact and conclusions of law to determine whether they are clearly erroneous. *Rule 29.15(j)*. "The trial court's findings and conclusions are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite and firm impression that a

mistake has been made." *Ervin*, 835 S.W.2d at 928.

### 1. Alleged Voir Dire Errors

Shurn first complains that trial counsel failed to ask the jurors about their ability to remain impartial after viewing "gruesome" photographs. The motion court found that trial counsel's inquiry during voir dire was strategic and that because Shurn did not dispute the manner of death but only his responsibility for it, this alleged error did not prejudice him. This Court agrees, and notes that trial counsel did ask some jurors whether such pictures would prejudice them.

Shurn next contends that trial counsel was ineffective for failing to ask venireperson Smith about her statement that her ex-husband "got off" a homicide charge. The motion court disagreed, finding that trial counsel sufficiently questioned her. The transcript indicates that the motion court's conclusion was not clearly erroneous, because trial counsel asked her several questions about the homicide charge, including whether she could be fair and have an open mind in Shurn's trial.

### 2. Failure to Request MAI–CR 3d 310.10

 The prosecutor asked Shurn about his 1985 conviction for possession of heroin and his 1979 conviction for failure to appear. MAI–CR 3d 310.10 instructs the jury that it must not consider prior "convictions as any evidence that the defendant is guilty of any offense for which he is now on trial." The trial court must give this instruction when a party requests it. *MAI–CR 3d 310.10, Note on Use 2.*

Shurn claims that trial counsel erred by not requesting this instruction. However, during the post-conviction proceeding, trial counsel stated he did not request the instruction because he did not want to underscore the prior conviction. This reasonable trial strategy is not ineffective assistance of counsel.

### 3. Alleged Errors in Questioning Detective Leyshock

 Shurn first contends that defense counsel erroneously permitted Detective Leyshock to inject his personal opinion of Shurn's guilt. During cross-examination by defense counsel, Detective Leyshock testified:

Q: Detective Leyshock, you've kind of made your life's work to put the Shurns in jail, haven't you?

A: I've stayed on top of them.

Q: You participated in the prosecution, the arrest of both Larry Shurn—is that correct?

A: Yes.

Q: —also Charles Shurn; is that correct?

A: That's right.

Q: And now you're trying to send this man [Shurn] to jail; is that correct?

A: *He deserves to go to jail.* [emphasis added].

Q: You feel that way, don't you?

A: Yes, sir.

Q: Okay. Now, you weren't present when Charles Taylor got killed, were you?

A: No, sir.

Read in context, trial counsel's questions did not prejudice Shurn. Trial counsel was merely attempting to show Detective Leyshock's bias against Shurn. This was reasonable trial strategy.

Shurn also contends that trial counsel erroneously permitted Detective Leyshock to inject hearsay statements into evidence. During cross-examination, defense counsel asked Detective Leyshock whether he had personal knowledge that Shurn's brothers told Shurn that Taylor was a potential witness. Detective Leyshock answered that someone told him that Larry or Charles told Shurn that Taylor was a potential witness. Defense counsel immediately countered this statement by asking Detective Leyshock whether he was present during this communication. Detective Leyshock responded that he was not.

 Defense counsel was attempting to show that Detective Leyshock had not heard Shurn's brothers tell Shurn that Taylor was a potential witness in their trials. Defense counsel cannot be ineffective for attempting

to impeach the state's witness and receiving a nonresponsive statement.

Finally, Shurn contends that defense counsel should have objected to Detective Leyshock's testimony that he had offered to put Taylor in a witness protection program. This testimony occurred on cross-examination by defense counsel. In fact, on direct examination by the state, Detective Leyshock first testified that Taylor stated he feared for his life because he had heard the Shurns were going to kill him. On cross-examination, defense counsel logically asked why Taylor refused the witness protection program. The transcript, as a whole, indicates that defense counsel effectively impeached Detective Leyshock about the witness protection program.

### 4. Failing to Object to Testimony about Taylor's Character

During the guilt phase, Taylor's wife testified that Taylor was a minister who read and carried a Bible every day. Defense counsel did not object, and later impeached Ms. Taylor about her husband's lack of religious training. Shurn complains that this evidence as to Taylor's character is inadmissible under *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and thus trial counsel should have objected to its admission.

In *Booth*, the United States Supreme Court reversed a death sentence because the state introduced a "victim impact statement" (which summarized interviews with the victims' family and described the effect of the crime on the family). *Id.* at 498–99, 501–02, 107 S.Ct. at 2530–31, 2532–33. The Supreme Court later overruled *Booth*. *Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

Even assuming it applied to Shurn's trial, *Booth* does not prohibit the introduction of this evidence. Evidence of Taylor's alleged religious nature does not compare to the "victim impact statement" in *Booth*.

### 5. Failing to Call Terry Westbrook

Shurn contends that defense counsel was ineffective for failing to call Terry Westbrook, who would have testified that Taylor always carried a gun in a "decoy Bible".

Shurn claims that this would have rebutted evidence of Taylor's religious nature and of his motive for carrying a gun.

Shurn did not mention Terry Westbrook in his motions for post-conviction relief, which stated that Lorenzo Westbrook "would have been able to corroborate movant's defense," and that Lorenzo Westbrook could have substantiated Shurn's good character and testified that Taylor threatened Shurn. Shurn's motions do not even mention Terry Westbrook. Claims of ineffective assistance of counsel that are raised for the first time on appeal are procedurally barred, and this Court will not consider such claims. *Ervin*, 835 S.W.2d at 929.

Even assuming that it is the same person, Shurn's post-conviction motions do not allege Westbrook could testify that Taylor always carried a gun and a decoy Bible to conceal it. This Court will not consider this new claim. *Id.*

Additionally, trial counsel's failure to call Westbrook was reasonable trial strategy. Trial counsel testified that, in his opinion, Westbrook would not have been a good witness and that Westbrook gave defense counsel the impression he did not want to testify.

### 6. Failing to Call Clifford Schwartz

Shurn contends that trial counsel was ineffective in failing to call Clifford Schwartz, who represented Shurn's brothers, Larry and Charles. Shurn claims Schwartz could have testified that Taylor did not testify in Larry's trial and would have refuted United States attorney Herzog's testimony that she told Schwartz that Taylor would be a witness against Charles.

During the evidentiary hearing, trial counsel testified that he did not call Schwartz because Schwartz would have corroborated the testimony that Larry saw federal prosecutors interviewing Taylor and, most importantly, that Taylor was a potential witness at the trials of Larry and Charles. Defense counsel made a reasonable strategic decision.

### 7. Failing to Present Evidence to support *Batson* Claim

Shurn complains about trial counsel's failure to present evidence of the prose-

cutor's history of striking black venirepersons. Shurn filed affidavits in the motion court from nine attorneys stating that the St. Louis County prosecutor exercised peremptory challenges to remove venirepersons on the basis of race.

The trial court found in this case that the prosecutor's reasons for striking the black venirepersons were valid and racially neutral. Evidence of a practice by the prosecutor's office would not have refuted this finding. Shurn could only have rebutted the trial court's finding with evidence that the prosecutor's use of strikes was racially motivated. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). Trial counsel's failure to produce the affidavits did not prejudice Shurn.

## 8. Stipulating to Ballistics Report

■ It was unclear at trial whether Shurn, Weaver, or both shot Taylor. No weapon was found, but .357 casings and a live .357 round were recovered in the getaway car. Defense counsel stipulated that the bullets recovered from Taylor's body and the crime scene were .357 caliber. Shurn claims this rendered counsel ineffective.

Defense counsel testified at the evidentiary hearing that he so stipulated because the caliber of weapon was irrelevant; Shurn's defense was that Weaver shot Taylor. Defense counsel correctly concluded that the stipulation did not prejudice Shurn.

## 9. Failure to Object to Comment that Larry Shurn's Bond was Revoked

■ During cross-examination of Shurn, the prosecutor asked Shurn whether he had talked to Larry after Larry's trial but "before he [Larry] got his bond revoked." Shurn complains that through this statement the prosecutor inferred that a court revoked Larry's bond because the Shurns were involved in Taylor's death. The statement does not infer why Larry's bond was revoked, and thus the statement did not prejudice Shurn.

## 10. Failure to Have the Court Admonish the Jury After Testimony Regarding Taylor's State of Mind

■ During the guilt phase of the trial, Taylor's wife testified that Taylor heard that he was threatened. Defense counsel objected to this statement, and the trial court sustained the objection as not responsive to the question. Shurn claims that trial counsel was ineffective for failing to have the court admonish the jury. The court ruled the testimony inadmissible, which was a sufficient response to a passing question-and-answer.

## 11. Failure to Object During Closing Arguments

Shurn claims that the motion court was clearly erroneous in denying his challenge to defense counsel's failure to object to certain comments by the prosecutor during closing argument in both phases.

■ Defense counsel stated that there was no strategic reason for failing to object to many of the prosecutor's statements. However, "failure to object, alone, does not establish ineffective assistance of counsel." *Antwine v. State*, 791 S.W.2d 403, 410 (Mo. banc 1990), *cert. denied*, 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991). Shurn does not allege with specificity the statements to which trial counsel should have objected. However, Shurn raised various claims before the motion court.

Many of the disputed arguments do not support an ineffective-assistance-of-counsel claim because they were based upon reasonable inferences from the evidence. Shurn complains about the prosecutor's comment, "He's [Weaver] there as a hit man." This was the state's explanation for Weaver's presence at the crime scene. Shurn likewise complains about the references to "drug empires" and "drug family." As stated previously, these statements referred to Shurn's family, and were reasonable in light of the Shurns' convictions on drug-related offenses and Shurn's own testimony that his brothers were involved in a large-scale drug business. Shurn contends that counsel should have objected to the prosecutor's various statements that people did not testify against the Shurns and live. Again, this inference was reasonable in light of the evidence that Taylor died two days before a trial in which he was a potential witness.

Shurn also complains about the prosecutor's comments about Shurn's note-taking during trial and that defense counsel coached him. As stated previously, such comments are permissible attacks on the defendant's credibility, and trial counsel's failure to object did not prejudice Shurn.

Shurn contends that trial counsel should have objected to the prosecutor's comments that he had the strongest evidence, that the jurors would never see such a strong case, and that he was the top law enforcement officer in the county and determined when to seek the death penalty. As previously noted, these statements were not improper, and trial counsel's failure to object did not prejudice defendant.

■ Finally, Shurn claims defense counsel should have objected to a reference to him as "scum." We agree. However, because this Court holds that this isolated reference did not prejudice Shurn, trial counsel's failure to object also did not prejudice him.

### 12. Failure to Prepare for Penalty Phase

Shurn contends that trial counsel did not adequately prepare for the penalty phase. Shurn particularly complains about trial counsel's failure to call Leporia Jones and Howard Daggs, who he claims would have testified about his good character.

At the evidentiary hearing, Shurn and his mother testified that they did not meet with trial counsel until after the jury convicted him. Trial counsel testified that he discussed the penalty phase of the trial with Shurn before the guilt phase had started, that he obtained the names of potential witnesses during the guilt phase, and that he discussed with Shurn's mother the possibility of her testifying at the penalty phase. Trial counsel admitted that he did not talk to any potential penalty-phase witnesses before the week of the trial, but denied telling Shurn he was unprepared for the penalty phase. Finally, trial counsel testified that few people could say "good things" about Shurn and that he did not recall witnesses who could provide testimony different from that of Shurn's mother and uncle.

The motion court found that trial counsel had expected he would have overnight to prepare for the penalty phase. The motion court also found that trial counsel "had prepared the penalty phase witnesses as well as he could." The motion court concluded that the testimony of Jones and Daggs would have been cumulative to the evidence presented during the penalty phase.

■ Trial counsel does not have an "absolute duty to present mitigating character evidence at the penalty phase of a trial." *Clemmons v. State*, 785 S.W.2d 524, 528 (Mo. banc), *cert. denied*, 498 U.S. 882, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990). However, trial counsel must make a reasonable investigation of possible mitigating evidence. *Id.* Trial counsel's decision that such an investigation is unnecessary must be reasonable. *Id.*

■ Trial counsel called witnesses during the penalty phase who testified to Shurn's childhood and role as a parent. Daggs and Jones would have provided the same testimony. Trial counsel does not have a duty to present cumulative evidence. *Id.*

■ Shurn also does not establish that trial counsel failed to make a reasonable investigation of possible mitigating evidence. Shurn contends that trial counsel could have introduced evidence of his drug rehabilitation. However, Shurn does not show that trial counsel's failure to introduce this evidence was due to a lack of investigation, or that the result would have been different had trial counsel introduced this evidence.

### C. Ineffective Assistance of Post–Conviction Counsel

■ Shurn claims that this Court must remand his case because of post-conviction counsel's failure to present evidence to support all of his claims. However, claims of ineffective assistance of post-conviction counsel are not cognizable. *Ervin*, 835 S.W.2d at 928–29.

## VII.

This Court affirms the conviction, sentence, and overruling of the Rule 29.15 motion.

All concur.